## A. P. HILL et al. *vs.* DANIEL McLAURIN et al.

Without the consent of both parties, they cannot make a contract binding, and without the capacity to comprehend fully the value of property sold, the nature and terms of the proposed contract, there can be no consent to its terms and conditions. *Held,* that a transaction under such circumstances, though having the legal form of a contract, would be voidable at the option of the parties interested in the property contracted for.

The chancery court cannot decree a distribution of the property as prayed for in the bill; but that court can, under the prayer for general relief, decree the title of J. D. & D. McL. null and void, and order it to be cancelled, so that the property can be regularly administered, and distributed through the action of the probate court.

After the sale shall have been declared void, the administrator will be accountable to the heirs for the property or its proceeds, just as if no sale had been made by the intestate to J. D. & D. McL.

The bill can be maintained for an account of the rents of the land, against the parties who have cultivated it.

ON appeal from the southern district chancery court at Monticello; Hon. A. B. Dawson, vice-chancellor.

The plaintiffs in error, who were complainants in the court below, filed their bill alleging that they were the grandchildren of Duncan McLaurin, deceased; that they were six in all, the children of Jefferson and Catharine Love, of Madison county,

and that the said Catharine's maiden name was Catharine McLaurin, the daughter of said Duncan McLaurin, deceased; that three of complainants were of age or married, but the other three, infants of tender years, prosecuting their rights in said bill by Hugh Love, their brother and next friend.

The bill then proceeds to allege, that the said Duncan McLaurin, deceased, departed this life at the advanced age of eighty years, in the spring or early in the summer of the year 1848, in Simpson county, in said State, leaving many children and grandchildren, (all of whom are named, the issue and descendants of three different marriages,) and that among the children surviving him, were said Daniel McLaurin and John D. McLaurin; that to these last-named persons, the sons of said Duncan, said Duncan towards the decline of life, for some fifteen years before his death, intrusted the chief superiorship and general management of his affairs, as to every thing requiring writing to be done, accounts to be stated, or legal instruments to be signed or executed; that said Duncan McLaurin amassed a large estate, real, personal, and mixed; was, in his better or younger days, a liberal feeder of his negroes, a good planter and cropper, but that for four or five years before his death, he became so mentally and physically enfeebled by age and infirmities, as to cease making crops of any account, and so penurious and childish as not to feed his negroes, causing them to be a nuisance to his neighbors; that the said Daniel and John D., perfectly well understood the enfeebled and exhausted condition of their father; that the said Daniel McLaurin called the attention of members of the family to the hopeless condition of the childishness and dotage of their father; that by way of convincing one of the members of the family that something must be done with the old man and his affairs, he took the pains to go with one of said members of the family to the old man's house, and attended at the meat house of the old man on purpose to see the food dealt out by the old man, and reported back to said member of the family that there were only thirteen pounds of newly killed beef, given out by the old man to seventy negroes, which did not admit of division among them.

The bill then charges that these pains were taken by the said Daniel in August, 1847, being the August preceding that of the old man's death, with a view to placing the estate of the old man beyond his control, and with a view to the pretended sale thereafter to be mentioned; that the said Daniel and the said John D. McLaurin possessed unlimited influence over their said father; that they well knew that he was incapable of making any contract involving any large amount; especially that he was incapable of making any contract involving the bulk of his property; that the said Duncan, from his condition, mental and physical, from the fact that Daniel McLaurin had been for many years the general agent of said Duncan, from the fact that John D. McLaurin had been residing with said Duncan McLaurin, on the same plantation and in the same house for many years preceding August, 1847, and continued so to reside at the time of the pretended sale thereafter to be referred to, up to the day of the death of said Duncan in 1848; from these and other facts, the bill charges that the said Duncan was the mere instrument in the hands of such men, his said sons, and subject to their management and undue influence.

The bill then charges, that with the old man thus circumstanced, laboring under a loss of memory and understanding, bordering on idiocy, incapable of disposing of his property with reason or due reflection as to amounts or the various objects of his bounty, the said Daniel McLaurin and John D. McLaurin gave out that they made the following unconscionable bargain, to wit: That on the eleventh day of November, 1847, the said Daniel and the said John D. purchased of the said Duncan McLaurin, the plantation on which he, the said Duncan, then resided, in Simpson, containing about 2,000 acres of valuable land, about seventy negroes, hogs, cattle, farming utensils, and all appointments necessary to such a plantation, for the consideration of twelve promissory notes, given out to have been made by the said John D. McLaurin and Daniel McLaurin, for $4,100 each, all dated on the 11th day of November, 1847, and falling due consecutively, on the 1st day of March, 1849, and so on annually thereafter, on the 1st day of each succeeding March until the day of payment

of the last of the series, which falls due on the first of March, 1860; that the said twelve promissory notes are all made payable to Duncan McLaurin, and are without interest and not liable to interest thereon.

The bill then charges, that the said property was worth in cash, fifty thousand dollars at the time of said pretended sale, and that the annual proceeds of the crops made on said plantation and by said negroes so as aforesaid pretended to have been purchased, would more than meet each of said pretended promissory notes of $4,100 each, as they fell due severally; that the said notes, as complainants believe, were made to fall due as above, so as to allow of the crops being gathered and of meeting them annually as they fell due, with the fraudulent design of making the property pay for itself.

The bill then charges, that either said pretended sale did not take place in fact, but having been talked of before the death of said Duncan, received from John D. and the said Daniel form and specification, after the said Duncan's death, or if there was such sale or any ceremony or form of proceeding, indicating said sale or contract, that such sale or contract, however indicated or under whatever forms or ceremony or by whatever legal solemnity evidenced, was either falsely and fraudulently obtained by the said John D. or the said Daniel, or both combining or confederating, or was procured by circumvention or undue influence brought to bear on a feeble mind, incapable of contracting, or so weak and incompetent as to be biassed in his actions by confidence in his said sons, or one or both of them, to do mechanically whatever they would require in the form of making or signing papers.

The bill then states, that complainants have vainly endeavored to find out the specific contract that was made, and the manner it was made, and who was present, but further than a return of said pretended notes in the inventory, thereinafter to be named, complainants are left wholly in the dark; the said Daniel and the said John D. sometimes giving out that said sale was solemnly made, and that deeds and bills of sale were made and executed, but the complainants believe that all such pretences of purchase, sale, or of such deeds or evidences of said sale, other than said promissory notes, returned as thereinafter

named, are false and fraudulent; and further, that if there were such evidences of sale or any thing of the kind except said promissory notes, then they were procured as charged above, and further, that the said promissory notes were not signed on the day of the date, or, if signed on that day, were but a part of said fraud, circumvention, or undue influence, as above charged, without being known, assented to, and understood by the said Duncan McLaurin, deceased, as the consideration of parting with his title to said estate, but imposed on him in some way, as an unmeaning ceremony or matter of course form necessary to his affairs, or pressed upon him in some way, as proper for his interest, without the subject being understood by him, the said Duncan.

The bill then states, that the said John D. and the said Daniel, instead of yielding up said estate of Duncan McLaurin, to descent and distribution agreeably to law, and as required by equity and good conscience, they have held on to said estate as if said pretended sale was a real and substantial contract made by one competent to contract on fair terms and full consideration, and that accordingly the said John D. has continued to reside on said estate so pretended to be purchased as aforesaid, and he and the said Daniel have exercised and claim full ownership over the same, ever since the death of the said Duncan, in fraud of the rights of the heirs at law of the said Duncan.

The bill then states, that said Duncan never left said estate so as aforesaid pretended to have been sold, but continued on said plantation so as aforesaid pretended to have been sold, to the day of his death, in the year 1848; that at said pretended sale, or by virtue or under said pretended sale, there was reserved (to save appearances) to said Duncan McLaurin, a family of some four or five negroes and other personalty, as to which, it is asserted by the said John D. and the said Daniel, that the said Duncan died seized and possessed of; upon which undisposed of property, of which it is claimed said Duncan died seized and possessed, the said Daniel McLaurin took out letters of administration from the probate court of Simpson county, in said State, at the October term of said court, in the year of the death of the said Duncan, to wit, the year 1848; that the said Daniel McLaurin, as administrator of

so much of said estate, returned an inventory thereof to said probate court of said county of Simpson, on the 20th of March, 1849, procured order to sell said reserved personalty and wild lands, and from said inventory and list of sales returned, said reserved estate appears thus stated: —

| | |
|---|---:|
| Debts due Duncan McLaurin, deceased, . . . . | $2,651 50 |
| Amount of sales of other personalty, . . . . . . | 3,918 17 |
| Sale of wild lands, . . . . . . . . . . . . | 1,247 76 |
| | $7,327 43 |

| | | |
|---|---:|---:|
| Debts returned desperate, . . . . . . | $282 70 | |
| Debts classed doubtful, . . . . . . . | 368 00 | 650 70 |

Net balance, . . . . . . . . . . . . . . . . $6,676 73

The bill then states, "said administrator, in said inventory, also returned twelve promissory notes, falling due as aforesaid from March, 1849, to 1st of March, 1860, each note being for $4,100, . $49,200 00."

As to these proceedings of the reserved estate, complainants not having investigated, have nothing to say, only that there has been no account or other step in said administration taken since March, 1849.

The bill then proceeds to set out the advancements and the value thereof, (as agreed on as correct by all the heirs,) made by the said Duncan McLaurin in his lifetime to his said children.

The bill then states, that Daniel and John D. McLaurin give out that they have procured releases of their interest in said estate pretended to be sold, from all the other numerous heirs of said Duncan McLaurin, deceased, except the complainants in this bill; that complainants, though applied to repeatedly and strenuously, have failed to settle with said administrator and release their interest, but insist on their legal rights and the enforcement of the same, as they are entitled to do by justice, equity, and law; that against them it is manifestly unjust and unconscionable that the said Daniel McLaurin and the said John D. McLaurin should continue to hold a large property, gained by fraud or undue influence of their decayed parent, without any adequate consideration, and for no other consider-

25*

ation but a charge on the property of a slight annuity or rent, payable for a dozen years, and at the end of that time, to have said property as their own in fee.

The bill then proceeds to interrogate Daniel McLaurin and ask a discovery as to all property received by him, as administrator; and to interrogate Daniel McLaurin and John D. Mc-Laurin, jointly and severally, and ask discovery of them as to all property, real, personal, or mixed, and all crops, hires, interests, choses in action, which they had of Duncan McLaurin, their father, by virtue of the said pretended sale, in his lifetime, or since his death ; and that the said Daniel and the said John D. discover and set forth all deeds, papers, liens, bills of sale, evidences of purchase which they have, or know of, as to the property, real, personal, and mixed, which they or either of them pretend to set claim to, as having received or gotten from the said Duncan McLaurin in his lifetime, or his estate since his death ; and that they discover, also, as to the correctness of the list of advancements set out in the bill, and averred to have been made in the lifetime of said Duncan McLaurin and to his said children.

Then comes the first prayer, that an account may be decreed to be taken, before a commissioner or master of the court, of all the estate of the said Duncan McLaurin and its increase, and all other matters as to which discovery had been prayed. The bill then proceeds: "And that your honor may decree that all deeds, bills of sale, liens made, or pretended to be made, by said Duncan McLaurin to the said John D. McLaurin and the said Daniel McLaurin, or either of them, of, in, and to said property, real, personal, and mixed, which they, the said John D. McLaurin and the said Daniel McLaurin, pretend, or claim, to have purchased of their said father, as aforesaid, be delivered up, and that the same be cancelled, and that said contract, or pretended contract of sale aforesaid, be rescinded and in all things held and declared to be null and void and of none effect; and that commissioners may be appointed to divide off and set apart to complainants their just share and proportion of the property remaining of said Duncan McLaurin, and their part, share, and proportion of all moneys, liens, notes, &c., found due

Hill et al. *v.* McLaurin et al.

on taking the account aforesaid, and that said proportionable share in property and money to which complainants would, or might have been entitled, had not such pretended sale have taken place, and all moneys or proceeds growing out of, or therefrom, be decreed to be handed or paid over to complainants, by said John D. and Daniel McLaurin, or either, as may seem consonant to equity.

Or, (2d prayer,) "that your honor would decree, after rescinding said supposed contract or pretended sale, and decreeing said deeds and instruments to be cancelled and annulled as aforesaid, that said Daniel McLaurin report to said probate court of said county of Simpson, for distribution and descent, all the estate of said Duncan McLaurin, deceased, precisely as if said pretended contract or sale had never been made, and that said Daniel McLaurin return an additional inventory of all the personal estate, effects, and increase, hire and rents, &c., or yearly value thereof, &c., to the said probate court of Simpson for distribution and settlement, according to law, so that complainants may have redress in said court."

Or, (3d prayer,) that complainants might have such other and further redress in the premises, as to the said court might seem right and just, and in accordance with equity and good conscience.

The defendants filed a demurrer to the bill, and at the same time, — as a distinct instrument on a separate piece of paper,— an answer denying all fraud, not specifically, but generally, — not the fraud charged in the bill, but all fraud universally. The court below sustained the demurrer, and dismissed the bill. And plaintiffs prayed appeal to this court.

*A. P. Hill* and *F. Smith*, for appellants.

A party cannot demur to a whole bill, and at the same time file an answer as to a part of it.

" The answer is not sufficient in containing a general denial of fraud. Every allegation from which fraud may be inferred, should be answered." *Gray et al.* v. *Regan*, 1 Cushm. 305.

In the case cited, the answer denied " fraud and combination " with a demurrer, at the same time, as in the case at bar.

The demurrer in the case now before the court assigned some seven or eight causes, which may be thus condensed: First. Admitting the allegations in the bill to be true, it is without equity, and the court could render no decree upon it. Second. The subject-matter of the bill is not of equity cognizance, but if existing at all, falls within the jurisdiction of the probate court of Simpson. Third. The bill is multifarious.

As to the merits of the bill. To disappoint the concocters of fraud, to protect infants, to enforce trusts and compel accounts, are four out of six of the heads of equity jurisdiction. 1 Mad. Ch. Book 2d, 23; *Bates* v. *Graves*, 2 Ves. 287–294; *Heuguenon* v. *Baseley*, 14 Ib. 273–301; *Griffiths* v. *Robins*, 3 Mad. Ch. R. 191, 192; *Davis* v. *Calvert et al.* 5 Gill & Johns. R. 269–313; *Attorney-General* v. *Parnther*, 3 Brown, Ch. R. 441; *Wheelan* v. *Wheelan*, 3 Cowen, 537. In notes (*r* * †) 1 Fonbl. Eq., 4th Am. ed., will be found the whole doctrine, with a host of authorities. 1 Fonbl. Eq. Book 1, ch. 11, § 3, p. 74; *Harding* v. *Handy*, 6 Cond. R. 236–294; 11 Wheat. 103; Starkie's Ev. (old ed.) vol. 3, note 2, and text 1701; Ib. part 4th, 1703–1705; Peake's Ev. (2d Am. from 2d Lond. ed.) 374, 375; 1 Mad. Ch. (4th Am. ed.) 255, 256, 257, 283; *Fitzgerald* v. *Reed*, 9 S. & M. 94–103; *Sessions* v. *Jones*, 6 How. Miss. R. 123; *Patterson* v. *Denton*, 1 S. & M. Ch. R. 125, 126, 592, 597, 598; *Cohea et al.* v. *Carrol*, being the case of a fraudulent pretended sale, 3 Ib. 545, 556, 558; *Michoud* v. *Girod*, 4 How. Sup. Ct. U. S. R. 503; 2 Story's Eq. 10, 11, 12.

The observance of the forms of law, however particularly carried out, and however fair the declarations and the showing made, yet when the surrounding circumstances show that the design was to commit a fraud on the law or on the rights of third persons, the false showing of fairness renders the device the more fraudulent, and insures to it the more certainly the indignant rebuke of a court of equity. *James* v. *Herring*, 12 S. & M. 341; *Jackson* v. *Garnsey*, 16 Johns. R. 190; *Comstock et al.* v. *Rayford et al.* 12 S. & M. 392–394; *Selser* v. *Ferriday et al.* 13 Ib. 722; *Wooten et al.* v. *Clarke*, 1 Cushm. 77, 78; *Henry* v. *Fullerton et al.* 13 S. & M. 633–644; *Trimble* v.

Hill et al. *v.* McLaurin et al.

*Turner et al.* Ib. 362, 363; *Rice* v. *Maxwell,* Ib. 291; *Wiggin & Wiggin* v. *Bush,* 12 Johns. R. 307–310; *Doe* v. *Martin,* 4 T. R. 66, 67.

In the nervous language of one of the old English judges, whose logical mind made the integrity of the law the adorning element of the bench: " The manner of the transaction was to gild over and conceal the truth; and whenever courts of law see such attempts made to conceal such wicked deeds, they will brush away the cobweb varnish, and show the transactions in their true light." C. J. Wilmot in *Collins* v. *Blantern,* 2 Wilson, 349.

The merits of the case cannot be denied or gainsaid. The argument is, however, that whatever the merits are, they must succumb to verbal criticism, to form, and the requirements of chancery practice.

In the first place, technical rules being established for the promotion of justice, are not to be enforced when their enforcement would defeat the ends for which they were established. 1 S. &. M. 413–437; 1 Cushm. 154–156.

Even if the bill were defective, there being merits in the case, then, between parties acting *sui juris,* where the bill shows from its whole statements taken together, without noticing informal matter, that the complainants have a case which ought to be heard, though defectively stated in the bill, as between such parties the court above would ordinarily affirm the dismissal, without prejudice to future action or proceeding, after a full opinion and thorough investigation of the subject, so there might be no further mistake or failure of justice. 5 S. & M. 563, 605, 745; 6 Ib. 99–350; 6 How. 319; 10 S. & M. 60; 12 Ib. 425–696.

But in cases where infants are complainants, the court above will put upon the record, after setting forth the defects and the merits, that order which it was the imperative duty of the court below to have made, namely, leave to amend; and for not placing such order on the record as the court below ought to have done in a case brought by infants having merits, the decree will be reversed and the cause remanded, with leave to amend. Mitford's Pleadings by Jeremy, 3d Am. ed. 27, 55,

327 ; Ib. 55, 91, 92, in the notes; *Stewart et al.* v. *Swansey et al.* 1 Cushm. 506; *Hart et ux.* v. *Dunbar*, 4 S. & M. 286–288; *Roberts et al.* v. *Edmunston et al.* 4 Ib. 730, 731.

" Even after the allowance of the demurrer, the court might be induced, under some circumstances, to set the cause on foot again, and to authorize amendment to the bill." 2 Welford's Eq. Pl. (late Eng. treatise) 268; 1 Ib. 169–173; *Green* v. *Creighton*, 10 S. & M. 162.

The courts judicially take notice of the course of proceedings in each other. 1 Welford, 4. " The style and character of pleading in equity, has always been of a more liberal cast than that of other courts, as mispleading in matter of form there has never been held to prejudice a party, provided the case made is right in substance, and supported by proper evidence." Last of note by Am. editor to Mitford, 42, 72; *Wheelan* v. *Wheelan*, 3 Cowen, 517, 538, 564, 571, 572, 585; 1 Ves. & B. 553; 21 Ves.

No matter of form can now, in this State, defeat an action in the common law courts, (by stat. 50, ch. 4,) and it would be something anomalous that technicalities should fail at law, and, under the same system, triumph at equity, to the letting in of the statute of limitations, to the success of fraud and villany, and to the mockery of good conscience in her own court. The court of last resort in this State, under the law as it now stands, never allows a case to go off on bad pleading, or technical errors coming up from the common law courts, but invariably remands the cause. In this connection, the remarks of Chancellor Buckner in *Wright et al.* v. *Shelton et al.*, are of much force. 1 S. & M. Ch. R. 403.

These remarks deprecatory of forms settling a great cause, are here inserted, not because they are called for by the case, but to show the defendants how little forms would avail in such case, to screen them from that purging of the conscience from which they now shrink, but to which they are inevitably doomed, however severe the infliction to that queasy nature incidental to gentlemen after adroitly fixing up things to their own advantage and the destruction of others.

There are three prayers for relief in this bill, and they are in the disjunctive. First, for rescission of the contract, account,

discovery, and full relief; second, or for rescission of the contract and discovery, and a report of the estate to the probate court of Simpson ; in other words, rescission and discovery, and nothing further, but then to leave the matter to the former it would belong to, if the fraudulent impediment had never been interposed; third, or for such relief as to the court might seem right. It will not do to say that the parties could not see exactly what they were called upon to answer, and if, upon discovery made, there could be any specific relief, or any relief of any kind whatever, the general prayer in the disjunctive will save the bill from failure.

" A demurrer, for want of equity, cannot be sustained, unless the court is satisfied that no discovery or proof, properly called for by, or founded upon the allegations in the bill, can make the subject-matter of the suit a proper case for equitable cognizance." Note 1 to Mitford, 163, citing *Bleeker* v. *Bingham*, 3 Paige, Ch. R. 246.

" If the plaintiff doubts his title to the relief he wishes to pray, the bill may be framed with a double aspect ; that if the court determines against him, in one view of the case, it may yet afford him assistance in another." Mitford, 39.

" If it be doubtful whether the facts of the case entitle the complainant to the specific relief prayed for, or to relief in some other form, his prayer concluding for general relief, should be in the disjunctive. In such case, although the complainant should not be entitled to the relief specifically prayed for, he may, under the general prayer, obtain any other specific relief consistent with the case made by the bill." Notes to Mitford's Pl., by Jeremy, 4th ed. 3d Am.

" It has been decided, and I think rightly, that where the complainant prays for particular relief, and for other and further relief, he can have no relief inconsistent with the specific relief asked, even though there may be just foundation for it in the bill. In such case, it seems the prayer for other relief must be in the disjunctive." *Pleasants & Co.* v. *Glasscock et al.* 1 S. & M. Ch. R. 24.

The prayers in the bill now before the court are made in the disjunctive, and so made with reference to the authority last above cited.

" When three kinds of relief are prayed for in the bill, and the complainant is entitled to one of them, the defendant cannot demur." *Western Ins. Co. of Buffalo* v. *Eagle Fire Ins. Co.* 1 Paige's Ch. R. 384, cited in notes, to Mitford's Pl. 39.

Three prayers in the disjunctive are made in this bill; by every rule of chancey proceedings, are we not entitled to rescission? or, are we not entitled to discovery to aid us in the prosecution of our rights before the probate court? or, are we not entitled to discovery, that there might be a rescission, a cancellation and annulling of the contract, and the titles and writing therewith connected?

• But the learned chancellor did not content himself with declaring the bill to be not a proper bill upon which relief could be granted, but, that however proper the bill, the probate court of Simpson had jurisdiction of the matter, and not the chancery court.

Then, second, as to the question of jurisdiction. Had not the decision of the court of appeals settled the question of jurisdiction, it would be enough to say that the constitution (art. 4, § 16) establishes a court of chancery, " with full jurisdiction in all matters of equity," and that constitution conferring no equity jurisdiction *eo nomine* upon the probate court, there could be nothing to settle as to where the jurisdiction lies, of the subject-matter of this case; but to ask, is the rescission of a contract, cancellation of instruments, the purging of conscience in frauds, or discovery, ever been known up to the days of the adoption of the constitution, to belong to a probate or ecclesiastical court, and, on the contrary, are they not matters peculiarly of equity cognizance *eo nomine ?*

But the court of appeals has placed the question upon unmistakable foundations.

The whole question is settled by *Hollman* v. *Hollman*, 5 S. & M. 559–563.

The probate court cannot settle " adversary claims," or " conflicting titles."   5 S. & M. 561, 562; *Bisland* v. *Hewett* et al. 11 Ib. 169.

The probate court has no jurisdiction " of contracts " nor of " frauds."   *Hart et ux.* v. *Dunbar*, 4 S. & M. 387; *Green* v. *Creighton*, 10 S. & M. 163.

Consent in these cases, cannot confer jurisdiction.  *Hollman* v. *Hollman,* 5 S. & M. 563 ; *Bisland* v. *Hewett et al.* 169.

Where all the parties bear official relation to the probate court, and the subject-matter of the controversy is directly conferred *eo nomine* by the constitution or laws, such as returning an inventory of the effects of the deceased, or a purchaser of land, filing his petition against the administrator for a deed, between such parties and in such cases where the main subject or feature of the controversy involves the exercise of a jurisdictional power expressly conferred upon the probate court by the constitution or the laws, and an inquiry as to other facts is merely incidental or collateral to the subject-matter of express jurisdiction in such cases and between such parties, the court of appeals have cautiously yielded assent to the proposition that the probate court might entertain jurisdiction to the extent of a contest by petition, and answer with an issue to the circuit court.  *Compton* v. *Compton et al.* 6 S. & M. 198 ; *Duncan* v. *Hogue,* 2 Cushman, 674.

Recommending, however, even in such cases and between such parties, that when remote rights are concerned and an incidental question of fraud involved, that it would be preferable to go into the chancery court at once.  *Duncan* v. *Hogue,* 2 Cushman, 674.   And if there be any legal proposition established by the high court, it is that the probate court has no jurisdiction over parties where either of the parties litigant bears " no official relation to the probate court."   This proposition is established early and late, and rests on foundations as firm as adamant.  *Green* v. *Tunstall,* 5 Howard, 651 ; *Duncan* v. *Hogue,* 2 Cushman, 674.

It is needless to this court to quote authorities, or to the point, that the court having jurisdiction over the main subject of the controversy, can give full relief, as the difficulty as to such matters is not as to the law, but the application.  ('Were authorities needed, they would be found collected in 5 How. 106, 108 ; 3 S. & M. 512.)   This is to us a clear case for the applicability of the doctrine that the court will not do its work by halves, but having jurisdiction for one purpose; — that is, the chancery court, — that this court will have that jurisdiction exercised as

Hill et al. *v.* McLaurin et al.

to all, and will have full relief given under the first prayer. But with a view to some of the decisions already referred to, and one other about to be cited, we drew the disjunctive second prayer, which is beyond all controversy a relief competent to the chancery court, this prayer is to rescind the contract, remove the impediment, and having done so, order Daniel McLaurin to go with an additional inventory to the probate court for settlement of the whole estate of Duncan McLaurin precisely as if the pretended contract had never taken place; where fraud is to be got clear of, or a settlement or contract, this second prayer appears to our humble comprehension beyond dispute, doubt, or cavil, and has been so expressly ruled by this court, in *Green* v. *Creighton*, 10 S. & M. 163; *Searles et al.* v. *Scott*, 14 S. & M. 98; *Neylans et al.* v. *Burge et al.* 14 S. & M. 294. A court of equity will not turn a party out of court, unless the remedy in a different forum be " clear and effectual and complete." Mitford Eq. Pl. 122, note 2; *Dolatrite et al.* v. *Orne*, 2 S. & M. 592; 8 S. & M. 779, 780, 786.

The third and last question we approach is multifariousness. If the prayer for relief is not multifarious, the statement of a case which would support a prayer for multifarious relief, cannot be demurred to. 1 Welford, 92, note (x); *Dick* v. *Dick*, 1 Hog. 290; Mitford, Eq. Pl. 39, American notes.

If the first prayer is multifarious, the second is not; if the second is, the third we know is not; and all the relief due to us can be granted under that third prayer, which some old chancery pleader has pronounced as being next to the Lord's prayer.

When all the plaintiffs have common interests, defendants demurring, it is a matter of discretion in the court to allow demurrer or not, depending on the facts of each particular case. 1 Welford, 92.

A bill asserting a general claim of right against distinct persons, having separate interests, is not demurrable. Mitford, 145, 146, 182, 183; 1 Welford, 39; Ib. 95; *Neylans et al.* v. *Burge et al.* 11 S. & M. 205.

The judges are to decide each case according to its particular facts. We humbly submit to the court from the embarrassments as well as the frauds of the defendants, that with a just

Hill et al. *v.* McLaurin et al.

deference and respect for the decisions of our own court of last resort, this bill could not have been drawn in any other mode known, at least to counsel, and that a demurrer ought not to succeed where there is enough to show that a fraud has been committed, — a deep, well-laid, well secreted fraud, on the rights of minors and orphans.

All which is submitted.

As to the point of multifariousness. Note 3, p. 412, § 538 of Story's Eq. Pl. 2d ed. As to the point of multifariousness being properly a subject-matter of review in the appellate tribunal, and not resting in the arbitrary discretion of the court below, (should such ground be assumed,) see the case of *Neylans et al.* v. *Burge et al.* 14 S. & M. 205.

As to the dividing line between the jurisdiction of the probate court and the chancery court, see same case of *Neylans et al.* v. *Burge et al.* 14 S. & M. 201, 205.

*Freeman, Dixon,* and *Foute,* for appellees.

The bill was demurred to in the court below, — demurrer sustained, and bill dismissed. The causes of the demurrer are set out in the record as follows:

1. The bill shows and alleges no fact which can give this court jurisdiction.

2. Said bill shows on its face that either the circuit or probate court of Simpson has full, complete, and exclusive jurisdiction of the remedy sought.

3. Said bill does not charge expressly that any fraud, circumvention, or undue influence was used or exercised by respondents in procuring the sale referred to in said bill.

4. Said bill and the allegations thereof neither admit nor deny that such a sale as described in said bill did or did not take place, and is therefore uncertain in the stating part thereof.

5. The prayer of complainants seeks a relief and remedy which is not in the power or jurisdiction of this court to grant.

6. Said bill seeks the aid of this court in aid of the action of the probate court of Simpson county, without alleging that the powers of said probate court were inadequate to the relief sought by said bill.

7. Said bill seeks a discovery from respondents without alleging that complainants have no other proof, or that a discovery from respondents is indispensable to the proof of the facts as alleged.

8. Said complainants pray a discovery upon which no decree or relief could be granted by this court without alleging that there is any suit pending in another court, or that said discovery is or will be needed in any suit now commenced or about to be commenced.

9. Said bill is multifarious because it prays an account against Daniel McLaurin in his individual capacity, and also in his character as administrator of Duncan McLaurin, deceased.

10. Because said bill seeks an account jointly against an administrator and a stranger unconnected with the administration, which said stranger according to the allegations of said bill claims, and is legally entitled to, one half of said property sought to be recovered by the bill.

11. Complainant prays a distribution of the property of their ancestor by commissioners to be appointed by this court, while the constitution and laws of the State give exclusive jurisdiction in matters of partition and distribution to the probate courts.

12. Said bill is multifarious because it seeks an account against an administrator for both real and personal estate, and the rents, hires, and profits and accretions resulting therefrom.

13. Said bill does not allege or show that any exceptions or objection has ever been made to the inventory returned by said Daniel McLaurin in the said probate court of Simpson county, or that he has ever failed upon legal proceedings to enforce the same to return a full and complete inventory of the estate of said Duncan McLaurin.

14. And for want of equity on the face of the bill under the foregoing objections, the bill will be easily tested by an examination of the following sections: Story's Equity Pleading, namely, 242–251, 271, 280, 313, 320, 325, 530, and note 1, 610 and note, and the notes appended. These authorities make it manifest that the bill is defective and subject to demurrer, — so defective as not to permit an amendment.

Causes of demurrer 3 and 4, relate to uncertainty in the bill. See Story, Eq. Pl. § 242, 245, 251.

Causes of demurrer 9, 10, 12, relate to multifariousness in the bill. See Story, Eq. Pl. § 271, 530, and note 1.

Causes of demurrer 9 and 10, relate to misjoinder of the parties. See Story, Eq. Pl. § 280.

Causes of demurrer 6, 7, and 8, relate to objection to discovery sought. See Story, Eq. Pl. § 313, 320, 321, and 610.

Causes of demurrer 2, 5, 10, and 13, relate to the jurisdiction of the court.

Mr. Justice FISHER delivered the opinion of the court.

This is an appeal from a decree of the vice-chancery court, holden at Monticello, sustaining a demurrer to the complainants' bill.

The bill alleges in substance, that the complainants are heirs at law and distributees of the personal estate of Duncan McLaurin, who died intestate, at his residence in the county of Simpson, in the spring of 1848. That Daniel McLaurin, one of the defendants, qualified as administrator on the estate of the intestate; that the said Duncan McLaurin was possessed, in the year 1847, of a large estate, consisting of about two thousand acres of land, seventy slaves, farming implements, stock, &c.; that the defendants, Daniel and John McLaurin, set up a title to this property, alleging that they purchased it from their father, Duncan McLaurin, on the 11th of October, 1847, for the sum of $49,200, payable in twelve equal and annual instalments. That the complainants are not informed who were present at the conclusion of the alleged trade, nor do they know that the same was in fact made, except from the acts and conduct of the pretended purchasers; that if such purchase were in fact made, it is void: first, because the said Duncan McLaurin was, at the time, mentally incapable of giving a binding consent to a contract, the bill setting forth minutely the causes which operated to impair his mind and to render him incapable of contracting; and, secondly, whatever consent was given, was obtained by the fraud and artifice of the purchasers. This being in substance the case made by the bill, we have no

26 *

hesitation in declaring, that the court below erred in sustaining the demurrer, for without consent of both parties there could be no contract, and without capacity to comprehend fully the value of the property, nature, and terms of the proposed contract, there could be no consent.   A transaction under such circumstances, though having the legal form of a contract, would be voidable at the option of parties interested in the property.

This is briefly the case as made by the bill; and, while we are of opinion that the chancellor cannot decree a distribution of the property, as specially prayed by the bill, he can under the prayer for general relief, declare the title of the defendants null and void, and order it to be cancelled, so that the property can be regularly administered and distributed through the action of the probate court of Simpson county.   After the sale shall have been declared void, the administrator will be accountable for the hires of the slaves, just as he would have been if no sale had been made by the intestate.   The bill can be maintained for an account of the rents of the land, against the parties who have cultivated the same.

Decree reversed, demurrer overruled, and cause remanded.